Ruth RETZLAFF, Plaintiff
and Appellant,

v.

GRAND FORKS PUBLIC SCHOOL DISTRICT NO. 1, a public corporation,
Defendant and Appellee.

Civ. No. 870370.

Supreme Court of North Dakota.

May 16, 1988.

Chapman and Chapman, Bismarck, for plaintiff and appellant, argued by Daniel J. Chapman.

Pearce & Durick, Bismarck, for defendant and appellee, argued by Gary R. Thune. Appearance by Robert L. McConn, Jr.

Jack McDonald, Jr., Bismarck, for amici curiae North Dakota Newspaper Ass'n and the North Dakota Chapter of the Society of Professional Journalists/Sigma Delta Chi.

ERICKSTAD, Chief Justice.

Ruth Retzlaff appeals from an order[1] dismissing her complaint against Grand Forks School District No. 1. We affirm.

Ruth Retzlaff was offered a contract to teach second grade at Belmont Elementary School in Grand Forks, North Dakota, for the 1986–87 school year. This case arose out of the decision of the school board of Grand Forks District No. 1 not to renew Retzlaff's teaching contract. The school board's decision not to renew Retzlaff's contract was based on the recommendations of Beth Randklev, Principal of Belmont Elementary School, and Gordon York, Assistant Superintendent for elementary education for the district.

The school board's decision is recorded in the minutes of its regular meeting on April 14, 1987:

"NONRENEWAL Dr. York asked the board to consider the nonrenewal of Ruth Retzlaff, a first year teacher at Belmont School. Ms. Retzlaff was recommended for nonrenewal by Beth Randklev, Principal, because of lack of skill in planning effective lessons and an inability to provide adequate instruction to students.

"Mr. McConn, school district attorney, reminded board members that first year to the profession teachers are not granted hearing rights by law. However, he said board members could accept a statement by the teacher on her own behalf. "Ruth Retzlaff then spoke to the board. She indicated that she did not agree with evaluations made of her work. She indicated she did not have documentation to support herself because she did not believe it was a job threatening issue.

"After some discussion by board members, the following motion was made:

MSC (Byron, Young)

Approve the nonrenewal

of contract for Ruth Retzlaff, Grade 2, Belmont.

Motion Carried.

"A vote was taken, and it was five (5) yes and three (3) no. In Favor: Kramer, Seabloom, Young, Youngs, Byron. Against: Carlson, Larson, Thompson."

By letter dated April 28, 1987, the clerk of the school board confirmed the school board's decision not to renew Retzlaff's contract. With seven additional paragraphs the letter explained why Retzlaff's contract would not be renewed for the coming school year.

Retzlaff filed a complaint in district court alleging she was denied certain rights provided by section 15–47–27.1, N.D.C.C. She also alleged that the school board "caused her to be unfairly castigated and held up to ridicule [and] ... caused great damage to her stature and reputation as a teacher...." At a summary judgment motion hearing Retzlaff also contended attorney Gary R. Thune was without authority to represent the school board and that individual school board members met with the school principal separately as a method of intentionally circumventing the "open meetings law." See § 44–04–19, N.D.C.C.[2]

---

1. The order is appealable pursuant to § 28–27–02(5), N.D.C.C., as construed in *Bond v. Busch*, 313 N.W.2d 704, 705 n. 3 (N.D.1981), which allows us to review:

"5. An order which involves the merits of an action or some part thereof...."

2. Section 44–04–19, N.D.C.C., provides:

"*44–04–19. Open governmental meetings.*— Except as otherwise specifically provided by law, all meetings of public or governmental bodies, boards, bureaus, commissions, or agencies of the state or any political subdivision of the state, or organizations or agencies

The district court subsequently granted the school district's motion for summary judgment.

On appeal Retzlaff contends: there were legal and factual questions relating to the school board's compliance with section 15–47–27.1, N.D.C.C.; the school board improperly delegated its authority; attorney Gary R. Thune was not authorized to represent the school board; and the school board violated the "open meetings law," section 44–04–19, N.D.C.C., by meeting privately with the school principal rather than holding a public meeting.

The parties agree that Retzlaff's teaching rights are defined exclusively by section 15–47–27.1, N.D.C.C., which reads:

*"15–47–27.1 First-year teachers— Evaluation—Renewal and nonrenewal of contracts.* Each school district and the director of institutions in this state shall have an established system through which two written evaluations are prepared during each school year for every teacher who is in his or her first year of teaching. The evaluation *must be in the form of written performance reviews,* and the first review must be completed and made available to first-year teachers no later than December fifteenth and the second review must be completed and made available no later than March fifteenth of each year. If a school board or the director of institutions determines not to renew the contract of a first-year teacher, written notification of the decision of nonrenewal must be given to the teacher no earlier than April fifteenth nor later than May first. Failure by a school board or the director of institu-

tions to provide written notification of nonrenewal to a first-year teacher by May first constitutes an offer to renew the contract of the teacher for the ensuing school year under the same terms and conditions as the contract for the current year. Such notification of nonrenewal given to a first-year teacher must contain a detailed description of the reason or reasons for the nonrenewal." [Emphasis added.]

Section 15–47–27.1, N.D.C.C., requires the school district to take three timely steps before a first-year teacher's contract is properly terminated. First, the school district must conduct an evaluation in the form of a "written performance review" and provide a copy of the "written performance review" to the first-year teacher not later than December 15. Second, the school district must conduct an evaluation and provide the second "written performance review" no later than March 15. Finally, the school district must provide written notification of its decision not to renew and a detailed description of the reasons for nonrenewal between April 15 and May 1.

On October 31 of the school year Retzlaff and the school principal, Beth Randklev, signed a "SUPERVISORY REPORT # 1." The report contains the following statement:

"Below is a list of educational goals that have been developed in accordance with the goal setting procedure of the school district's supervisory process.

"A discussion of these mutually agreed upon goals has occurred between the teacher and supervisor." [3]

supported in whole or in part by public funds, or expending public funds, shall be open to the public. The governing members of the above bodies, boards, commissions, agencies, or organizations meeting in violation of this section shall be guilty of an infraction for a first offense. A public or governmental body, board, bureau, commission, or agency meets in violation of this section if it refuses any person or persons access to such meeting, unless such refusal, implicitly or explicitly communicated, is due to a lack of physical space in the meeting room for the person or persons seeking access."

**3.** The report listed the following goals for the 1986–87 school year:
"1. To become familiar with the scope and sequence for the 2nd grade Scott–Foresman series. I will look through the last units of the books to see where the students are going.
"2. To place an emphasis on reading with an 'attitude of urgency' for reading development. Strive to have all second graders on grade level by May!
"3. To set up reading clubs within each group to promote independent reading or do a class/group incentive system. I will vary these throughout the year to continue the interest.

Principal Randklev's affidavit states she personally observed Retzlaff in the classroom on six different days before the first evaluation took place.

Retzlaff contends the trial court improperly granted summary judgment because the first "Supervisory Report" was not, as section 15–47–27.1, N.D.C.C., requires, a "written performance review." The statute does not define the term "written performance review," but both parties submitted affidavits from individuals in the education field setting forth their respective definitions.

Section 15–47–27.1, N.D.C.C., originated in Senate Bill 2394 of the 1983 legislative session. Part of the legislative history [4] of

4. Section 15–47–27.1, N.D.C.C., was discussed by the North Dakota House Education Committee on March 9, 1983, and March 15, 1983, as part of Senate Bill 2394 of the forty-eighth legislative assembly. The minutes of those hearings reveal that the definition of "written performance review" was discussed:

"HOUSE EDUCATION COMMITTEE
"March 9, 1983
"SB 2394—Relating to school board procedures with respect to nonrenewal of teachers' contracts
 * * * * * *
"*STEVE SWIONTEK, Fargo, Dist. 45, Sponsor....* He pointed out section on written performance system. He felt this is the best way to review, document, and justify your reasons for change or removal of an individual. Also can be used to improve performance. The bill requires these to be left up to each individual school district."
 * * * * * *
"HOUSE—EDUCATION
"March 15, 1983
 * * * * * *
"*Rep. Olsen* asked for a defining of formal review.

section 15–47–27.1, N.D.C.C., indicates that some individual legislators had their own concept of a "written performance review," but that no precise definition was formed. Indeed, two legislators suggested the definition should be entrusted to each school district.[5]

While the legislative history is inconclusive, we believe the "Supervisory Report" which indicates that Retzlaff met with her supervisor and discussed the attainment of certain educational goals substantially complies with section 15–47–27.1, N.D.C.C. We have previously ruled that substantial compliance with the procedural requirements for termination is sufficient if their purpose is fulfilled. *Stensrud v.*

"*Rep. Hoffner* gave his interpretation.
"*Rep. Olsen* asked if it meant a formal interview of teacher, administration and school board member.
"*Rep. Hoffner* said it could include that.
 * * * * * *
"*Rep. Swiontek* said he liked amendments but if three reviews have problems with dates, maybe 2 formal reviews are enough. He also thought some of the existing language should be left in. He said what language and why. He also told what he thought a formal review should be."

At the two hearings, Representatives Hoffner and Swiontek described their idea of the written performance review as follows:

"[Rep. Hoffner]: Mr. Chairman and Representative Olsen: I guess this would be basically up to the discretion of the local school district, but it would be my interpretation that ah, they would observe the teacher.... [inaudible] The principal or assistant principal, superintendent within the system monitor when the teacher comes to work, when the teacher leaves, all of this I'm sure would be part of the evaluation.
 * * * * * *
"[Rep. Swiontek]: I think the definition of formal review is that you ah, observe the individual, you ah, document the observations and discussions of other individuals and that you actually sit down with that individual and that teacher. I think that's very important that the principal or the superintendent sit down with that individual on a one-to-one basis and goes over everything, positive points as well as suggestions for improvements and that after that they sign off on it and the teacher gets a copy of it and the superintendent or principal retains a copy."

5. *See* comments of Representatives Swiontek and Hoffner *ante* n. 4.

"4. To follow the organization/management/planning system developed by Mrs. Hutton in working with 3 reading groups.
"5. To hold a conference with Dr. Randklev (minimum of one per month) to discuss my progress and development as a teacher and to report on my goals.
"6. To help students develop positive self images. I will devise a system of rewards for good work and good behavior.
"7. To help the group work together for smooth classroom management. I will help the children practice complimenting each other daily, clapping for each other as they receive recognition."

*Mayville State College,* 368 N.W.2d 519, 522 (N.D.1985) (oral notice to terminate college instructor substantially complied with procedural requirement that notification be in writing); *see also, Quarles v. McKenzie Public School Dist. No. 34,* 325 N.W.2d 662, 669 (N.D.1982) (court would "exalt form over substance" if it invalidated teacher's nonrenewal because school board failed to provide teacher right to a seven day continuance guaranteed by statute. Thus, where teacher failed to assert denial of continuance harmed her, her nonrenewal was valid, notwithstanding teacher's statutory right to continuance).

The purpose of the performance review is to apprise the first-year teacher of the administration's professional expectations and alert the teacher of any deficiencies in his or her work. An examination of the response to the motion for summary judgment and the affidavits in support thereof contain no contention that Retzlaff was not apprised of the administration's expectations or that she was not alerted to any deficiencies. Her contention before the school board apparently was that she was not apprised that her performance was a "job threatening issue." This cannot be the test. Although the "Supervisory Report" signed by Retzlaff and Randklev does not set forth any alleged deficiencies, we think it substantially complies with section 15–47–27.1, N.D.C.C.

■ Retzlaff also argues the Grand Forks School Board has improperly delegated its responsibilities during the nonrenewal process. Retzlaff argues (1) the school board blindly followed the recommendations of the administration and should have made an independent determination of her teaching abilities, and (2) the school board's written notice of nonrenewal was invalid because the letter came from the clerk of the school board rather than the school board itself. Retzlaff summarizes her point with the question: "[W]ho is in charge here?" Neither of these contentions is convincing.

Retzlaff agrees that the statute does not give a first-year teacher a right to a hearing but insists the school board relied too heavily on the administration's recommendation in voting not to renew her contract. Retzlaff contends that if an administration recommended nonrenewal by submitting a one sentence letter to the school board, *e.g.,* "[W]e recommend nonrenewal because teacher X has had bad discipline," the school board could not properly vote to not renew because the school board does not have sufficient information to make a decision. Retzlaff contends the administration should have to produce evidence to support its recommendation of nonrenewal.

We do not believe that section 15–47–27.-1, N.D.C.C., relating to nonrenewal of first-year teachers, requires the production and introduction of evidence such as would be required in a judicial hearing or an administrative hearing, or even in a nonrenewal hearing for teachers who have taught more than one year. Retzlaff's argument overlooks the legislature's decision pursuant to section 15–47–26, N.D.C.C., to omit first-year teachers from the protections provided in sections 15–47–27 and 15–47–38, N.D.C.C. Section 15–47–38(5), N.D.C.C., provides, among other things, that prior to nonrenewal of teachers who have taught more than one year, the school board must give reasons for nonrenewal and the reasons:

> "[M]ust be drawn from specific and documented findings arising from formal reviews conducted by the board with respect to the teacher's overall performance.... The reasons given by the board for not renewing a teacher's contract must be sufficient to justify the contemplated action of the board and may not be frivolous or arbitrary but must be related to the ability, competence, or qualifications of the teacher as a teacher, or the necessities of the district such as lack of funds calling for a reduction in the teaching staff."

This latter hearing is to be distinguished also from the more expansive hearing provided for in discharge for cause cases under section 15–47–38(2), N.D.C.C.[6] In addi-

6. A school board contemplating discharging a teacher for cause must afford the teacher many

tion, section 15–47–38, N.D.C.C., also provides:

"At the meeting, the board shall discuss the reasons and determine whether or not the administrator has, in fact, substantiated the reasons. If the board finds that the reasons have not been substantiated, the nonrenewal proceedings will be dismissed."

The legislature clearly excluded first-year teachers from all of these protections.[7] Accordingly, Retzlaff's assertion that the school board did not conduct its own investigation is without merit in light of the fact that the statute relieved the school board of that duty.

Retzlaff next asserts the school board should have sent the letter explaining the reasons for nonrenewal instead of the clerk of the school board. Retzlaff asks: "Is it not the board who must determine what the reasons are for nonrenewal? Where does a clerk of the board get this authority?" Again, Retzlaff's questions overlook the legislature's decision to expedite nonrenewal decisions of first-year teachers. The answer is that the legislature relieved the school board of the burden of making independent findings with respect to the competency of first-year teachers. It may have been more appropriate for the chairperson of the school board to have signed the letter, but in light of the subsequent board action, in effect ratifying its previous decision, this contention also lacks merit.

■ Retzlaff next asserts attorney Gary R. Thune has no authority to represent the school board. We said in *State Bank v. City of Bismarck*, 316 N.W.2d 85, 88 (N.D. 1982), that when a duly licensed attorney appears in an action or proceeding, the court must proceed upon the presumption that the attorney before it is authorized to appear and represent the person for whom

the attorney assumes to act. In *State Bank* we quoted from *Campbell v. City of Hot Springs*, 232 Ark. 878, 341 S.W.2d 225, 227 (1960):

" '[I]t is incumbent on the party undertaking to question the authority of the attorney representing his adversary, to show to the Court by affidavit, facts sufficient to raise a reasonable presumption that the attorney is acting in the case without authority from the party he assumes to represent, then, and not until then, the attorney may be required to show his authority.' "

Retzlaff has failed to produce any evidence that attorney Thune acts without the school board's authority. Retzlaff relies upon an affidavit made by another teacher within the district which reads:

"That she has attended many of the school board meetings in the Defendant school district and she has examined the minutes of the meetings which she did not attend and she is unable to find any instance when the school board of the Defendant school district has engaged the services of Mr. Gary Thune as its attorney and she is unable to find and is unaware of any direction to said attorney for the handling of this lawsuit on behalf of the school district."

The probative value of this affidavit is minimal as it merely asserts that as there is no evidence that the attorney was appointed by the board, it must be concluded that attorney Thune was not authorized to act for the board. The affidavit fails to rebut the presumption that an attorney is authorized to act for the person or entity he ostensibly represents. *State Bank, supra; Rolfstad, Winkjer, Suess, McKennett & Kaiser v. Hanson*, 221 N.W.2d 734, 736 (N.D.1974).

---

of the procedural rights found in the North Dakota Administrative Agencies Practices Act. Section 15–47–38(2), N.D.C.C., reads in part:

"All procedures relative to evidence, subpoena of witnesses, oaths, record of testimony, decision, rehearing, appeals, certification of record, scope and procedure for appeals, and appeals to the supreme court shall be conducted in accordance with the provisions of

sections 28–32–06, 28–32–07, 28–32–09, 28–32–10, 28–32–11, 28–32–12, 28–32–13, 28–32–14, 28–32–15, 28–32–16, 28–32–17, 28–32–18, 28–32–19, 28–32–20, and 28–32–21."

7. By definition the term "teacher," as used in §§ 15–47–38 and 15–47–27 does not include "teachers who are in their first year of teaching." § 15–47–26, N.D.C.C.

Finally, Retzlaff argues the school board violated the open meetings law by privately meeting with the principal in groups of two and three to discuss Retzlaff's nonrenewal. After the school board voted not to renew Retzlaff's contract at its regular meeting on April 14, 1987, Principal Randklev met with one or two school board members at a time during the first two weeks of June 1987. Randklev met with seven of the nine school board members. Randklev describes these "Informal Meetings" as follows:

"During these sessions I responded to questions from the individual board members and described my year with Miss Retzlaff. I brought no written documentation to any of these sessions, did not share any items from her personnel file, and never met with more than two board members at any one time. No administrator or other person was present at any of these sessions."

Retzlaff contends these meetings violated the open meetings law because: "When one person from the board meets with an administrator to obtain information to be used in connection with a board decision, we say that that is a meeting within the definition of Sec. 44–04–19, N.D.C.C." We disagree.

We addressed similar arguments in *Danroth v. Mandaree Public School District No. 36*, 320 N.W.2d 780 (N.D.1982) and *Peters v. Bowman Public School District No. 1*, 231 N.W.2d 817 (N.D.1975). In *Peters* the school board admitted violation of section 44–04–19, N.D.C.C. The school board met privately and discussed whether or not Peters' contract should be renewed. The school board then voted at an open meeting not to renew Peters' contract. *Peters* at 820. We said:

"[T]he action of the school district in this case a clear attempt to evade § 44–04–19, N.D.C.C.

"When the official action of the school district is clearly the product of an illegal meeting, documented in the minutes, and

not clearly denied in the testimony, such official action is invalid even though such official action is taken at an otherwise legal meeting."

We remanded to the district court with instructions that the district court direct the school district to reconsider its actions in an open meeting. *Id.*

Similar facts were present in Danroth and we saw "no reason to overturn the rule of law announced in *Peters v. Bowman Public School District No. 1.*" *Danroth* at 782. It was clear in both *Danroth* and *Peters* that the nonrenewal vote was a "product of an illegal meeting." In the case at bar, however, members of the school board held their alleged secret meetings seven weeks *after* the board voted not to renew Retzlaff's contract. Apparently the members of the board wanted to confirm the wisdom of a previous decision. Under these peculiar circumstances, where the alleged secret meetings occurred seven weeks after the nonrenewal vote had been taken at a regular, open meeting, we conclude that neither the public nor Retzlaff was prejudiced. We say this particularly in light of the fact that had Retzlaff been entitled to a hearing, either the board or Retzlaff could have elected to have the hearing closed.[8] In this instance Retzlaff was invited to meet with school board members but declined.

The school district asks this Court to define "meetings" under section 44–04–19, N.D.C.C., in terms of the number of board members present at any gathering. The school district refers us to *Moberg v. Independent School District No. 281*, 336 N.W. 2d 510, 518 (Minn.1983) in which the Minnesota Supreme Court interpreted its open meeting statute as follows:

"We therefore hold that 'meetings' subject to the requirements of the Open Meeting Law are those gatherings of a quorum or more members of the governing body, or a quorum of a committee, subcommittee, board, department, or commission thereof, at which members

---

8. Section 15–47–38(5), N.D.C.C., reads in relevant part: "The meeting must be in executive session of the board unless *both* the school board and the teacher agree that it is to be open to other persons or the public." [Emphasis added.]

discuss, decide, or receive information as a group on issues relating to the official business of that governing body."

We find it unnecessary to consider adopting the "quorum rule" at this time but we invite the legislature to consider the issue as the next case in this area of the law may involve similar investigative discussions of less than a quorum prior to official action.[9]

For the reasons stated herein, the order dismissing Retzlaff's complaint is affirmed with statutory costs to the school district.

GIERKE and MESCHKE, JJ., concur.

Vande Walle, Justice, concurring specially.

I concur in the majority opinion. I write separately to emphasize that if the series of meetings among some of the members of the school board had taken place prior to the decision not to renew Retzlaff's contract, for the purpose of evading the constitutional and statutory open-meeting requirements, I would reverse regardless of whether or not a quorum of the board was present at those meetings. Because no action was taken subsequent to the meetings at issue, the remedy applied in *Peters v. Bowman Pub. Sch. Dist. No. 1,* 231 N.W.2d 817 (N.D.1975), is not applicable. Furthermore, at the time *Peters* was written in 1975 there was no remedy for a violation of the open-meeting statute. The provision making a violation of the statute an infraction was not enacted until 1977. See Section 44–04–19, N.D.C.C., as amended by 1977 N.D. Laws Ch. 417. As a matter of policy we should not signal approval of any attempts to evade the open-meeting requirements established in the Constitution and statutes of the State of North Dakota.

Insofar as the issue of fact is concerned, the return to the motion for summary judgment and the affidavits in support of the return deal with whether or not the "goal setting" was an evaluation as a matter of law. I concur in the majority's conclusion that at the trial court level no issue of fact as to substantial compliance was raised. *Stensrud v. Mayville State College,* 368 N.W.2d 519 (N.D.1985).

LEVINE, Justice, concurring and dissenting.

While I agree that substantial compliance with the procedural requirement of a written performance review is all that is required, I believe that whether the "supervisory report" constitutes substantial compliance is a question of fact. I would therefore reverse the trial court's summary judgment and remand this case for trial.

Substantial compliance is that degree of conformance with a procedural requirement necessary to accomplish the purposes of that requirement. *See Stensrud v. Mayville State College,* 368 N.W.2d 519, 522 (N.D.1985). So, exact conformance is not necessary, if "the substantial interests [the] procedures are designed to safeguard are in fact satisfied and protected...." *Stensrud v. Mayville State College* at 522, quoting *Piacitelli v. Southern Utah State College,* 636 P.2d 1063, 1067 (Utah 1981).

Whether there is substantial compliance is ordinarily a question of fact. *Stensrud v. Mayville State College, supra* at 523. The majority concludes that the purpose of the performance review is to inform the teacher of the administration's expectations and to alert the teacher of any deficiencies in her work. It becomes a material ques-

9. A majority of jurisdictions have adopted a quorum rule by statute as a means of defining a meeting which must be open to the public. *See* Note, *The Minnesota Open Meeting Law After Twenty Years—A Second Look,* 5 Wm. Mitchell L.Rev. 375, 389–90 nn. 70 and 72–73 (1979).

Amici North Dakota Newspaper Association and the North Dakota Chapter of the Society of Professional Journalists/Sigma Delta Chi urge this Court not to adopt a quorum rule. Amici contend governmental bodies could circumvent the open meetings law by gathering in small groups of less than a quorum. Amici maintain that "[i]f members of public body are conducting public business, it is a public meeting." This broad formulation reshapes the question rather than answering it. Although we decline to formulate a definition herein, we believe the appropriate definition must begin with the proposition that the public's need to be informed must be balanced against the equally imperative public need for effective and efficient administration of government.

tion of fact then, whether Retzlaff was in fact alerted to her deficiencies and informed about the administration's expectations of her performance as well as the consequences of not fulfilling those expectations.

I concur with the majority's resolution of the other issues in this case but respectfully dissent from its treatment of the issue of substantial compliance and from its affirmance of the summary judgment.