DECISION
The Attorney General of the State of Rhode Island, as plaintiff, has brought this action against defendants the Charlestown Town Council (the "Council") and Council members Charles W. Beck, Mary L. Hargraves, and John Craig Jr., in their official capacities, alleging numerous violations of the Open Meetings Act (the "Act") connected with meetings between members of the Charlestown Town Council and the Narragansett Indians in June and July of 1995. After a non-jury trial, this Court finds that the Council violated the Open Meetings Act in certain respects (although not willfully) and did not violate the Act in other respects.
Factual Background and Procedural History
In 1995, and at the time of the meetings which form the basis for the present complaint, the Charlestown Town Council was comprised of five members: Charles W. Beck, President; Mary L. Hargraves, Vice President;[1] John O. Craig Jr.; Charlene Q. Dunn; and Forester C. Safford. In March of 1995, Councilwoman Dunn suggested hosting a social function between the Council and the Narragansett Indians for the purpose of opening a dialogue and establishing a positive relationship between the parties. The Council followed up on this suggestion at a special meeting that it convened on June 7, 1995 to discuss a social meeting with the Narragansett Indians proposed for June 9, 1995. The Council advertised the special meeting by public notice dated June 5, 1995, indicating that a special meeting of the Town Council would be held on June 7, 1995 and that the meeting would be held in executive session, closed pursuant to the litigation exception to the Open Meetings Act, R.I. Gen. Laws §§ 42-46-4 and 5, followed by an agenda workshop.
The Council met, as advertised, on June 7, 1995. After calling this meeting to order, Councilman Beck moved that the Council go into executive session, closed pursuant to the litigation exception of the Act. The Council approved this motion unanimously, and the Council met in executive session. According to the testimony of Councilman Beck, during this closed session, the Council discussed the proposed social meeting with the Narragansett Indians and directed Charlestown Town Solicitor Philip M. Sloan Jr. to contact the Narragansett Indians. While the minutes do not reflect that a separate non-executive session occurred after the executive session, the minutes do reflect that at some point after certain matters had been discussed in closed session, the Council voted unanimously to return to an open meeting and to seal the minutes of the executive session.[2]
The minutes then state that "Attorney Sloan was requested by the Council to contact Attorney Killoy to inform him that the upcoming meeting with the Tribe will be held only as a social gathering, and no business will be discussed." The Council then adjourned the special meeting. After adjourning, the Council held an agenda workshop for the upcoming June 12, 1995 meeting of the Council.
It is undisputed that the public notice and agenda for the meeting of June 7, 1995 did not reference the topic of a proposed social meeting with the Narragansett Indians. In addition, while the minutes of this meeting do reflect that the Council would be meeting socially with the Narragansett Indians, the minutes available to the public do not reflect the Council's discussion or decisionmaking process in this regard, they do not indicate whether that social meeting was discussed and agreed upon in executive session or otherwise, nor do they indicate the views or votes of any particular Councilperson on that subject or the date of the proposed social meeting. In addition, there are no minutes of the agenda workshop. The minutes of the June 7, 1995 meeting only reference that "the Council met to prepare the agenda for the upcoming Council meeting on June 12, 1995." The only evidence of the content of the agenda workshop session is the agenda itself.
The Town Council and the Narragansett Tribal Council met for dinner, as planned, on June 9, 1995. The evening was a social gathering that was closed to the public, but the evidence indicates that no official matters were discussed. After this dinner, Councilman Beck and Tribal First Councilman Matthew Thomas remained in contact.
The Tribal Council subsequently invited the Town Council to meet with the Narragansett Indians at the Four Winds Community Center. The Council discussed that potential meeting at its June 12, 1995 open meeting and agreed to the meet with the Narragansett Indians on June 22, 1995. According to the meeting minutes, Councilman Beck commented that "as far as he knows [the meeting of June 22, 1995 with the Narragansett Indians would be] an open meeting." Councilwoman Dunn requested that Charlestown Assistant Solicitor Bruce N. Goodsell confirm this open status with the Narragansett Indians.[3] In addition, Councilwoman Dunn and Charlestown citizens present at the meeting requested that the public be notified in advance if the meeting were to be closed. The Council, however, did not decide or vote on whether the meeting would be an open meeting for purposes of the Open Meetings Act.
After the June 12, 1995 meeting, the Narragansett Indians informed the Council, apparently through their respective attorneys, that they only would agree to meet on June 22, 1995 in a closed session. According to Councilman Beck, the Narragansett Indians wanted the meeting to be closed to avoid the need for police escorts and the general hostile atmosphere that had occurred at other meetings such as the "fiasco in West Greenwich" where gaming had been discussed with the community. As a result, the Council decided to convene a special meeting on June 19, 1995 to discuss again the meeting with the Narragansett Indians proposed for June 22, 1995 and the issues created by the Narragansett Indians' mandate that the June 22, 1995 meeting with the Council be closed. As certain members of the Council wished to meet with the Narragansett Indians, but were concerned about complying with the Open Meetings Act, the Council contacted Solicitor Goodsell, prior to the June 19, 1995 special meeting, to solicit advice on how to proceed. The Town Council also asked Solicitor Goodsell to contact the Attorney General's Office for advice regarding the planned meeting to try to ensure compliance with the Open Meetings Act.
On June 19, 1995, the Council convened the special meeting, open to the public, to discuss meeting with the Narragansett Indians in closed session. At the meeting, Solicitor Goodsell opined that the Council could not meet in closed session with the Narragansett Indians on June 22, 1995 by invoking the litigation exception to the Open Meetings Act because litigation would not be the exclusive issue discussed. Solicitor Goodsell also stated that, as requested, he had contacted the Attorney General's Office seeking guidance on the issue of the proposed meeting, but was informed that the Attorney General did not give advisory opinions and that as a result "there is no way one would find out until it is over whether it is an open meetings law issue".[4]
Solicitor Goodsell then advised the Council that if less than a quorum of the Council (i.e., no more than two out of its five members) met with the Narragansett Indians, as proposed by Councilman Beck, then the meeting would not be in violation of the Act.
After some discussion by the Council and members of the public at the June 19, 1995 meeting, members of the Council made a series of four motions. First, Councilwoman Dunn proposed seeking the assistance of the Governor to arrange a meeting with the Narragansett Indians on neutral ground with the full Council in attendance. This motion, however, did not carry; Councilpersons Dunn and Safford voted for the motion, while Councilpersons Craig, Hargraves and Beck voted against it.
Councilwoman Hargraves then made a motion that two members of the Council meet with the Narragansett Indians on June 22, 1995. This motion carried by a vote of three to two with Councilpersons Craig, Hargraves and Beck voting in the affirmative. The purpose of the meeting was not discussed.
Councilwoman Hargraves then made another motion to have Solicitor Goodsell draft a letter to Governor Almond explaining the Council's difficulty in meeting with the Narragansett Indians under the Open Meetings Act. This motion also carried with the support of Councilpersons Craig, Hargraves and Beck.
Councilman Beck then moved to have the Council appoint him, Councilman Craig and Solicitors Goodsell and Sloan to meet with the Narragansett Indians on June 22, 1995 and to report back to the Council at the June 26, 1995 meeting. This last motion also carried by the three votes of Councilpersons Craig, Hargraves, and Beck.
On June 22, 1995, Councilmen Beck and Craig and Solicitors Goodsell and Sloan met with most of the Narragansett Indian Tribal Council at the Four Winds Community Center. As the Narragansett Indians requested that this meeting be held privately on tribal lands, it was not open to the public. After dinner, the group toured the community center and looked at the Narragansett Indians' proposal for the expansion of its facilities to include a new health center and housing development. The evidence indicates that while the Narragansett Indians raised the issue of gaming, no substantive discussions on this issue took place. The parties agree that no independent notice of the June 22, 1995 meeting was posted, no agenda for this meeting was prepared and no Council minutes were taken.
On June 23, 1995, the day after the meeting, the Town and the Narragansett Indians issued a joint press release which by all accounts gave a fair description of the content of the June 22, 1995 meeting. The release stated that:
 the Narragansett Indian Tribe hosted a first meeting and dinner with the representatives of the Charlestown Town Council, President Charles W. Beck and Councilman John O. Craig. The reception followed by dinner was held at the Narragansett Indian Tribe's new Four Winds Community Center. The meeting of over two hours afforded an opportunity for the tribal leaders and the councilmen to exchange concerns and ideas on upcoming tribal developments and plans. The basic strategy for phased development on [sic] its bingo facility, its Senior Meals and Child Day-Care Center were discussed, and its plans for the Indian Health Center were described.
The release also stated that both groups agreed to follow up "with future monthly meetings for which specific agendas will be prepared and where issues will be discussed in detail."
On June 26, 1995, the Town Council held its regularly scheduled open meeting. After calling the meeting to order, Councilwoman Hargraves made a motion to "add to the Agenda under Council Comments a report of the June 22nd meeting with the Narragansett Indian Tribe." The Council approved this motion unanimously, and Councilmen Craig and Beck reported on the June 22, 1995 meeting. Both Councilmen relayed to the Council the Narragansett Indians' continued unwillingness to meet in an open forum. Councilman Beck again attributed this refusal to meet openly to what had taken place in West Greenwich when controversial open meetings between the Narragansett Indians and the public had been held. Councilman Beck described the June 22, 1995 meeting as one at which he and Councilman Craig listened in an effort to establish a method of formal communication between the Council and the Narragansett Indians. According to the minutes of the June 26, 1995 meeting, Councilman Beck reported that at the June 22, 1995 meeting, the parties discussed certain aspects of litigation involving Narragansett Electric, Nynex, and the Narragansett Indians. In addition, the Narragansett Indians raised issues regarding community center construction, housing and schools. Lastly, the issues of a bingo hall and its effect upon the surrounding area were discussed.
At the June 26, 1995 Council meeting, Councilman Beck also introduced a draft letter from the Council to Governor Almond asking for his assistance in amending the Open Meetings Act so as to exempt a quorum of the Charlestown Town Council when meeting with the Narragansett Indians on tribal lands. Upon the request of Councilwoman Dunn, however, the Council took no action regarding the letter because there was a dispute as to whether the requested letter had been agreed upon at the June 19, 1995 meeting. The Council and members of the public then discussed the Town's future course of action. Councilman Beck announced July 18, 1995 as the next proposed date for a meeting with the Narragansett Indians. Councilman Craig added that an agenda would be passed back and forth so that the Council members would know the topic of meetings "weeks in advance". While Councilwoman Dunn reiterated her concern over only part of the Council attending the meetings, neither she nor any other Council member moved to discontinue the meetings with the Narragansett Indians. The minutes of this meeting also do not reflect any discussion regarding the agenda of the planned July 18, 1995 meeting with the Narragansett Indians or of possible discussion topics for that meeting.
Prior to the planned July 18, 1995 meeting, Tribal First Councilman Thomas informed Councilman Beck that he wanted to "present something" for Beck to bring back to the full Council. According to his testimony, Councilman Beck assumed that the presentation involved a proposed gaming facility. At the July 18, 1995 meeting between Councilmen Beck[5] and Craig, the Town Solicitors and the Narragansett Indians, which was held in the Tribal Administration Office, the parties discussed the Narragansett Indians' proposed housing development. The Narragansett Indians expressed some concern to Councilmen Beck and Craig about building a road to the development. Councilmen Beck and Craig told the Narragansett Indians to submit a formal request to the Council. Toward the end of the meeting, Tribal Medicine Man Lloyd Wilcox took the floor and gave a short presentation outlining the Narragansett Indians' plans for a bingo facility. The Narragansett Indians requested input from the Council regarding the proposed bingo facility, such as concerns regarding public safety, to be presented formally to the Narragansett Indians on an expedited basis within fourteen to thirty days. Councilman Beck told the Narragansett Indians that he and Councilman Craig would take the request back to the Council. It is undisputed that the July 18, 1995 meeting between the two Councilmen and the Narragansett Indians was not noticed separately in advance, made the subject of an agenda or recorded in the form of minutes made available to the public.
Again, the parties issued a joint press release on July 19, 1995 which by all accounts accurately reflected the events of the previous day's meeting. According to the press release:
 [t]he purpose of [the] meeting was to further the opening of a dialogue and to begin constructive work in addressing issues of current concern for both communities. The meeting was not a negotiating session, however it is the parties['] joint expectation that negotiation will commence in the near future. Each group brought limited agendas to the meeting and raised specific issues for consideration by the other.
 The Tribal Council informed the Town Councilmen on the Tribe[']s plans to build a gaming facility offering Class II bingo and games otherwise permitted in the State of Rhode Island.
 While describing proposed operations as reduced in scale from those developed for the West Greenwich site, the tribal council noted that, as the neighboring community, Charlestown should make its desires known to the [T]ribe and they suggested that, as part of an overall agreement on gaming matters, the [T]ribe would remunerate the Town for interim costs in providing services to the Tribe's gaming operation such as public safety, police, or fire protection, as may be required. The Town Councilmen responded that they would report on the meeting and bring the request to an upcoming meeting of the Town Council.
 On another matter[,] the Tribe expressed a desire to acquire the Kingswood Court roadway and appurtenant easements for the Wetuomuck Community Housing Village. The town councilmen suggested that the [T]ribe make a formal request of the Town Council for this action. The Tribal Council indicated that it would consider and make the request.
 The other elements of the Town's agenda presented to the Tribal Council included a brief discussion of the RI Open Meetings Law considerations in light of settlement of prior litigation, a request to exchange town and tribal staff and administrative department personnel and contact lists.
The urgency of the Narragansett Indians' request for input from the Town prompted the Council to schedule a special open meeting for July 25, 1995 to discuss the Narragansett Indians' proposal. Prior to this meeting, Solicitor Goodsell received a telephone call from the Governor's legal counsel, John Partridge, protesting any action by the Counsel to discuss gaming issues with the Narragansett Indians. After an hour-long discussion by telephone between Mr. Partridge, Councilman Beck and Town Solicitors Sloan and Goodsell, it was clear to all that the Governor did not want the Council to participate in any gaming discussions with the Narragansett Indians. The Governor encouraged the Council, however, to discuss non-gaming issues.
According to the testimony of Councilman Beck, prior to the meeting of July 25, 1995, no specific response to the Narragansett Indians' request had been drafted. Solicitors Goodsell and Sloan had prepared a memorandum dated July 24, 1995 which explained the Narragansett Indians' request and the July 27, 1995 deadline and contained a suggested list of Council concerns. At trial, Councilman Beck testified that he subsequently learned the underlying reason for the imperative nature of the Narragansett Indians' request for input from the Town made at the July 18, 1995 meeting. Under the Indian Gaming Commission Regulations, the Narragansett Indians needed the Town's support before they could proceed with their plans for a bingo facility.
At the beginning of the meeting of July 25, 1995, Councilman Beck explained his conversation with Attorney Partridge and suggested that the meeting be adjourned, as it had been convened only to discuss the Narragansett Indians' proposal and there was no need to proceed with that discussion in deference to the Governor's request that any dialogue with the Narragansett Indians regarding gaming be suspended. Councilman Craig then moved formally to adjourn the meeting, but that motion failed to carry upon a two-to-two vote of the Council, with Councilwoman Hargraves not present or voting.
Councilwoman Dunn then made a motion to "present a motion." Councilman Beck objected, stating that there was only one posted reason for the meeting (i.e., discussing the Narragansett Indians' proposal) and that any motion made on other issues would be inappropriate. Councilwoman Dunn's motion to allow a motion, however, carried. She then moved as follows:
 that the Charlestown Town Council immediately suspend all actions to dilute the intent of the open meetings law and instead work to arrange public meetings with the Narragansett Tribal Council that are open to the citizens of Charlestown and Narragansett Tribal members alike that would allow the whole Charlestown Town Council to represent the Town of Charlestown in full view of its citizens.
This motion did not carry upon a two-to-two vote.
The meeting then was adjourned by unanimous vote upon the motion of Councilman Safford. The draft minutes of the July 25, 1995 meeting, which were the only minutes available to the public within two weeks of the meeting, did not include any reference to Councilman Craig's defeated motion to adjourn, Councilwoman Dunn's two motions or the votes taken or discussion on those motions. The final minutes prepared by the Council were complete and accurate in this regard. These final minutes also include a copy of minutes taken by Dinalyn Spears, the Narragansett Indians' Tribal Secretary, at the July 18, 1995 meeting between the Council and the Narragansett Indians. These minutes taken by the Tribal Secretary, however, are not alleged to be minutes kept by the Council for the purposes of the Act.
The Attorney General, as plaintiff, filed the instant Complaint in September of 1995, alleging in Count 1 that beginning on June 7, 1995 and continuing thereafter, defendant Charlestown Town Council held meetings to discuss meetings to be held with the Narragansett Indians that violated the Open Meetings Act. In Count 2, plaintiff alleges that the Council improperly noticed the June 7, 1995 Council meeting, discussed business at that meeting relating to the social meeting planned with the Narragansett Indians for June 9, 1995 which was not included in the notice or placed on the agenda, and otherwise conducted the meeting in violation of the Open Meetings Act. In Counts 3 and 4 of the Complaint, plaintiff originally alleged that in holding the closed social meeting with the Narragansett Indians on June 9, 1995, without independent notice to the public, an agenda or minutes, the Council willfully violated the Open Meetings Act. Plaintiff voluntarily dismissed both of these counts, however, on March 20, 1996, immediately prior to trial. In Count 5, plaintiff alleges that the Council, by majority vote of Council members Beck, Craig and Hargraves, authorized Councilmen Beck and Craig to meet on June 22, 1995 in closed session with the Narragansett Indians, that the meeting on June 22, 1995 constituted a meeting of the Council, and that the Council and its members violated the Open Meetings Act by discussing Council business in closed session at the June 22, 1995 meeting and by failing to post notice, prepare an agenda or keep minutes of that meeting. Count 6 of the Complaint alleges that the actions of Councilmen Beck and Craig in attending the June 22, 1995 meeting with the Narragansett Indians and the action of Councilpersons Beck, Craig and Hargraves in authorizing them to attend were willful violations of the Open Meetings Act. Count 7 of the Complaint, similar to Count 5, alleges that the Council and its members violated the Open Meetings Act by discussing Council business in closed session at the July 18, 1995 meeting between Councilmen Beck and Craig and the Narragansett Indians and by failing to post notice, prepare an agenda or keep minutes of that meeting. Count 8 of the Complaint, similar to Count 6, alleges that the actions of Councilmen Beck and Craig in attending the July 18, 1995 meeting and the actions of Councilpersons Beck, Craig and Hargraves in authorizing them to attend were willful violations of the Open Meetings Act. In Count 9 of the Complaint, plaintiff alleges that the Council violated the Open Meetings Act with regard to its July 25, 1995 special meeting by failing to make available to the public, within two weeks, accurate minutes of that meeting. Lastly, in Count 10, plaintiff alleges that the actions of the Council and its members in this regard were willful violations of the Act.
To remedy the violations of the Act asserted in Counts 1, 2, 5, 7 and 9, the Attorney General seeks: 1) an injunction preventing the Council from future violations of the Act; 2) a declaration that any actions or votes taken at the meetings in question are null and void; and 3) such other and further relief as this Court shall deem just and proper. To remedy the alleged willful violations of the Act by Councilpersons Beck, Craig and Hargraves contained in Counts 6, 8 and 10, plaintiff seeks to impose civil fines against them.[6]
This matter was heard by this Court sitting without a jury on March 20-21, 1996. At the conclusion of this non-jury trial, this Court reserved judgment and asked the parties to submit post-trial memoranda addressing the legal and factual issues in dispute. After a review of the testimony, evidence, and the parties respective post-trial memoranda, together with further research and review of the laws of Rhode Island and other jurisdictions, this matter is now ripe for decision.
The Town Council Meeting of June 7, 1995(Counts 1 and 2)
In Counts 1 and 2 of the Complaint, the Attorney General claims that the Charlestown Town Council violated the Open Meetings Act with respect to its June 7, 1995 meeting at which the Council discussed arranging a social meeting with the Narragansett Indians for June 9, 1995. The Attorney General alleges that the Council, through its members, violated the Open Meetings Act because (1) it did not properly notify the public in advance that the June 7, 1995 meeting would be open and that the proposed June 9, 1995 social meeting with the Narragansett Indians would be a topic of discussion at that meeting; (2) it failed to add the proposed June 9, 1995 social meeting to the agenda at the June 7, 1995 meeting either at the outset of the meeting and before the Council went into executive session or when it reconvened in public session; (3) it discussed the proposed social meeting improperly in executive session; and (4) it did not reflect the vote and discussion regarding meeting with the Narragansett Indians socially in the minutes of the meeting nor do those minutes or the agenda prepared at the agenda workshop properly reflect the content of the workshop session.[7] These alleged violations with respect to the June 7, 1995 Council meeting will be addressed sequentially.
The Attorney General first contends that the published notice of the June 7, 1995 special meeting was defective because it failed to identify that meeting as open to the public. The relevant notice, published on June 5, 1995, stated as follows:
 A special meeting of the Town of Charlestown will be held on Wednesday, June 7, 1995 at 7:00 P.M. at Town Hall, 4540 South County Trail. Meeting will be held in Executive Session, closed pursuant to Open Meeting Law, Chapter 46, Section 42-46-4 5 (2) Litigation, followed by an Agenda Workshop.
Plaintiff's Ex. 22. The Charlestown Town Council denies that it is required to advertise a meeting as open, rather it asserts that it simply must notify the public when meetings are closed.
The notice provision of the Open Meetings Act, R.I. Gen. Laws § 42-46-6, does not specifically address the question of whether a public body must inform the public in advance as to whether a meeting will be held in open or closed session. It does suggest that the public should be informed, in advance, of the agenda for the meeting, which arguably would include information as to its openness. Id. § 42-46-6(b), (c). A meeting cannot be closed, however, until a quorum of the public body convenes a meeting by "open call" and a majority of its members votes to close the meeting pursuant to the Act. Id. §§ 42-46-2 through 42-46-5.
As a public meeting cannot be closed until an open meeting is convened and the proper procedures are followed under the Act to close the meeting, it necessarily follows that it is improper to indicate to the public in advance that a scheduled meeting will be closed. Meetings are presumed to be open unless and until properly closed at an open meeting. The notice of any public meeting, therefore, should not suggest that a meeting will be held in closed session, as that might interfere with the public's ability, at an open meeting, to object to its closure and might result in the closure of meetings that otherwise would be held in open session if put to an open call and majority vote. While the notice provision of the Act does not explicitly require a public body to give affirmative notice that a meeting will be open, inclusion of such a statement in a notice certainly would be prudent. At a minimum, however, the notice cannot state, in advance, that a meeting will be closed (unless that matter has been decided previously in an open meeting by open call and majority vote) and, at most, may indicate that the public body may seek at an open meeting to go into closed executive session for a stated purpose.
The notice published by the Charlestown Town Council was defective and misleading in violation of the Act. It suggested to the public that the Council would be meeting only in closed executive session to discuss litigation matters when, in fact, the Council had not yet convened openly to vote on whether to go into executive session, as required by the Act. The notice suggested that there not only would be no open meeting for the purpose of voting by open call to go into executive session but that there would be no open meeting following the executive session. It is unclear from the notice whether the agenda workshop would be closed when in fact it had to be open unless and until closed in accordance with the Act. The notice could suggest to a citizen not familiar with the nature of an agenda workshop that even that portion of the meeting would be closed. The deficient notice undoubtedly had the effect of deterring public participation in a meeting open to the public, thereby thwarting the purposes of the Open Meetings Act.
The Attorney General next contends that this notice was further violative of the Act because it did not indicate that discussions would occur at the June 7, 1995 meeting regarding a proposed social meeting between the Council and the Narragansett Indians at Angel's Restaurant scheduled for June 9, 1995. Alternatively, plaintiff argues that even if the Council did not know of that agenda item as of the time it published notice of the June 7, 1995 meeting, it failed to vote at the June 7, 1995 meeting to amend the agenda to add the topic of the meeting with the Narragansett Indians, as required by the Act. Plaintiff contends that the Council improperly characterized the proposed social meeting as a litigation matter that it could discuss in executive session and which did not have to be noticed for discussion, included as part of the agenda for the public meeting or recorded in minutes available to the public. In its answer, the Council denied these alleged violations of the Act but failed to articulate its reasoning.
The notice provisions of the Act require that written notice of all regularly scheduled meetings should be supplied at the beginning of every calendar year and again forty-eight hours prior to the actual meeting. Id. § 42-46-6(a), (b). These notices must include the dates, times and locations of the meetings. Id.
§ 42-46-6(a). In addition, supplemental notice as to any meeting must be given at least 48 hours prior to the meeting and must include a statement as to the nature of the business to be discussed at the meeting. Id. § 42-46-6(b). This "agenda" may be altered at the actual meeting so as to add additional items by majority vote of the members. Id. § 42-46-6(b).
The published notice regarding the June 7, 1995 meeting did not indicate that the Council would discuss the social meeting between the Charlestown Town Council and the Narragansett Indians proposed for June 9, 1995. From the evidence, it appears that the social meeting had been set up or at least was contemplated as occurring at the time the Council published notice of the June 7, 1995 meeting. Notice of the proposed social meeting and the Council's plans to discuss it thus could have been published in advance. Regardless, that topic could have been added to the agenda by majority vote at the June 7, 1995 meeting. Instead, the topic of the social meeting between the Council and the Narragansett Indians neither appeared in the published notice nor was it added by vote to the agenda.
It appears that the Council or certain of its members had decided in advance of the June 7, 1995 meeting to treat the proposed social meeting with the Narragansett Indians as a litigation matter to be discussed in closed session under §§42-46-4 and 5 of the Act. Indeed, Councilman Beck took the position that the statement in the published notice that litigation matters would be discussed in executive session at the June 7, 1995 meeting included the social meeting because of ongoing litigation between the Narragansett Indians and the Town. It may have been for this reason that the Council did not publish advance notice of the planned discussion, describe the nature of the litigation matters to be discussed prior to going into executive session or make that a topic for public discussion until after it had been raised or discussed in executive session — at which point the Council did not formally add the topic to its agenda or otherwise record its substantive discussion and decisionmaking process in minutes available to the public.
The provision of the Open Meetings Act regarding the closure of meetings by public bodies provides that:
 By open call, a public body may hold a meeting closed to the public upon an affirmative vote of the majority of its members. A meeting closed to the public shall be limited to matters allowed to be exempt from discussion at open meetings by § 42-46-5. . . . [T]he reason for holding a closed meeting, by a citation to a subdivision of § 42-46-5(a), and a statement specifying the nature of the business to be discussed, shall be recorded and entered into the minutes of the meeting. No public body shall discuss in closed session any public matter which does not fall within the citations to § 42-46-5(a) referred to by the public body in voting to close the meeting, even if these discussions could otherwise be closed to the public under this chapter.
R.I. Gen. Laws § 42-46-4. More specifically, R.I. Gen. Laws §42-46-5 provides that a public body may close a meeting in order to discuss issues "pertaining to collective bargaining or litigation."
It is difficult to understand how the mere existence of ongoing litigation between the Town and the Narragansett Indians could convert a social meeting between the Council and the Narragansett Indians into a litigation matter. By definition, for the proposed meeting to be a "social" meeting, no business whatsoever could be discussed, regardless of whether the business involved ongoing litigation, pending proposals or any other Town Council matter. As such, the Council had no authority to close the meeting of June 7, 1995 to discuss that topic or to withhold notice of that topic in the published notice, at the open call prior to voting to go into executive session or by failing to add the topic to its agenda after coming out of executive session. The published notice of the June 7, 1995 special meeting should have referenced the social meeting as a topic to be discussed in open session. Alternatively, the published notice should have advertised a public meeting and that topic should have been added to the agenda by majority vote at the June 7, 1995 meeting. If the Council, at the open public meeting, wanted to discuss the proposed social meeting in closed executive session (believing it to fall under the litigation exception), then that topic should have been identified and been made the subject of an open call so the propriety of going into executive session to discuss the social meeting could have been discussed and voted upon. The Council's failure to comply with these notice requirements and its discussion of the proposed social meeting in closed session without advance public notice of its intention to do so violated § 42-46-3, 4, 5 and 6 of the Act — violations made more serious by the content of the published notice regarding the June 7, 1995 meeting which deterred public participation in that meeting at its inception.
The Attorney General further claims in Count 2 that the Council violated the Open Meetings Act by failing to record proper minutes of the Council meeting and the agenda workshop that followed it on June 7, 1995. The defendants offer no response regarding the minutes of the meeting but respond that the agenda produced at the agenda workshop constitutes the minutes required to be made and kept as to the work session.
The Open Meetings Act requires that all public bodies keep written minutes of all of their meetings. Id. § 42-46-7. These minutes must include the date, time, and place of the meeting, along with a record of all votes taken at the meeting and how each member voted. Id. § 42-46-7(a). These minutes shall be available to the public within two weeks of the date of any such vote. Id. § 42-46-7(b).
The minutes of the June 7, 1995 meeting that were made available to the public reflect that certain matters discussed in executive session were redacted from the minutes, pursuant to the Council's unanimous vote to seal the minutes of the executive session. To the extent the Council improperly discussed and voted upon the social meeting with the Narragansett Indians in closed session, therefore, the public was deprived not only of the benefit of having any discussion and voting take place in a properly advertised open session but also of access to minutes of the executive session that would elucidate that discussion or voting, in violation of the Act.
In addition, the minutes that were not sealed implicitly suggest that the Council agreed to met with the Narragansett Indians socially as long as no business was discussed. The minutes do not make clear, however, when the Council agreed to meet socially, the date of the proposed meeting, whether that agreement was reached in executive or open session, whether all Council members were present and were parties to the agreement, what prompted the meeting with the Narragansett Indians and whether there was any discussion on the subject by the Council in executive and/or open session. The combined effect of the failures regarding notice, the improper closing of the meeting to discuss the social meeting in executive session and the deficiencies in the minutes is that the public was deterred from participating in the meeting and that only those citizens who did attend were privy to the discussion and votes, if any, regarding the proposed social meeting that took place in open session.
Moreover, this Court disagrees with defendants' assertion that the agenda created at the "agenda workshop" constituted the necessary minutes of that portion of the June 7, 1995 Council meeting. The Act expressly requires that the minutes include the date, time, and place of the meeting, the members of the body who are present, and a record of individual member votes. Id. §42-46-7(a), (b). The agenda produced on June 7, 1995, as reported in the minutes of June 12, 1995, merely states what will be discussed at the June 12, 1995 meeting. It does not state where and when the agenda was created. It also does not state which Council members were present and responsible for creating the agenda. It does not reflect whether the Council voted not to add certain items to the agenda. As such, it is per se insufficient.
In addition, the minutes kept for the portion of the June 7, 1995 meeting prior to the agenda workshop are also insufficient to qualify as the required minutes for the agenda workshop. While these minutes do contain the statement that "[the] Council met to prepare agenda for upcoming Council meeting on June 12, 1995," this statement is inserted after the more formal Council meeting had adjourned. At that time, members were free to leave, and a second separate meeting began. Thus the Council members present for the earlier executive session may not have been the same members present at the agenda workshop. Similarly, the location of the meeting may have changed. Lastly, there may have been a break in time between the adjournment of the formal session and the commencement of the agenda workshop. As a result, the Council failed to keep proper minutes of the June 7, 1995 meeting and agenda workshop in violation of § 42-46-7 of the Act.
Accordingly, judgment shall enter for plaintiff against the Council as to Counts 1 and 2 of the Complaint, in that the Charlestown Town Council failed to properly advertise the meeting, failed to add items to the agenda at the meeting for public discussion, improperly closed the meeting and allowed matters to be discussed improperly in closed session, and failed to record and make available to the public proper minutes of the meeting and the agenda workshop that followed it in violation of §§ 42-46-3, 4, 5, 6 and 7 of the Act. While plaintiff asks this Court to declare null and void any action taken by the Council at the June 7, 1995 meeting, there was no action previously taken by the Council at that meeting that at this juncture is appropriate for invalidation. This Court instead enjoins the Council and its members from engaging in similar future violations of the Act and directs the Council to review its practices and procedures with regard to advertising meetings, preparing and voting on agendas for meetings, closing meetings and preparing minutes of meetings and workshop sessions to ensure that future violations do not occur.
The Meetings of June 22, 1995 and July 18, 1995 Between TwoMembers of the Charlestown Town Council and the Narragansett Indians(Counts 5-8)
The Attorney General claims in Counts 5 and 7 of the Complaint that the Charlestown Town Council and Councilmen Beck and Craig violated various provisions of the Open Meetings Act when those two Council members, constituting less than a quorum of the Council, met in a non-public forum with the Narragansett Indians on their tribal lands on June 22, 1995 and July 18, 1995. The parties agree that the Council did not publish independent public notice of these meetings in advance, prepare an agenda for the meetings or keep written minutes of the meetings which were made available to the public. The parties also agree that the meetings were not open to the public, following a request by the Narragansett Indians that the meetings be held privately.
The essential legal dispute between the parties is whether the Open Meetings Act applies to these meetings. The defendants argue that the Act is inapplicable because it requires a quorum of a public body to be present to constitute a meeting that is subject to the Act's requirements. Plaintiff counters that there is no quorum requirement imposed by the Act.
The preamble to the Open Meetings Act provides that "it is essential to the maintenance of a democratic society that public business be performed in an open and public manner and that the citizens be advised of and aware of the performance of public officials and the deliberations and decisions that go into the making of public policy." R.I. Gen. Laws § 42-46-1. While this goal of openness is broadly stated, the Act, by its own terms, applies not to all acts, deliberations, and decisions of every public official but only to "meetings" of "public bodies". See
R.I. Gen. Laws §§ 42-46-2 through 42-46-7. The Act mandates in this regard that "[e]very meeting of all public bodies shall be open to the public unless closed pursuant to §§ 42-46-4 and42-46-5." Id. § 42-46-3. It further requires that all public bodies give written notice to the public in advance of their meetings in such a manner as to apprise the public of the time, place and date of the meeting and the business to be conducted at the meeting. Id. § 42-46-6. In addition, all public bodies must keep minutes of their meetings which include information as to where and when the meeting occurred, who attended, what votes were taken and who voted in what manner. Id. § 42-46-7(a). After the public body holds the meeting, the minutes and a record of all votes taken must be available to the public. Id. §42-46-7(b).
For the Act to apply, therefore, two basic criteria are needed: first, there must be a "meeting"; and second, the meeting must be of a "public body." Id. § 42-46-2-7. In its definitional section, the Act defines a "meeting" in pertinent part as:
 the convening of a public body to discuss and/or act upon a matter over which the public body has supervision, control, jurisdiction, or advisory power. As used herein, the term "meeting" shall expressly include, without limiting the generality of the foregoing, so-called "workshop," "working," or "work" sessions.
Id. § 42-46-2(a). Thus the definition of "meeting" also imposes the requirement that a "public body" convene itself. The Act further defines a "public body" as:
 any department, agency, commission, committee, board, council, bureau, or authority or any subdivision thereof of state or municipal government.
Id. § 42-46-2(c).
In determining whether the Act applies to the meetings held between less than a quorum of the Charlestown Town Council and the Narragansett Indians, the threshold question is whether these meetings involved a "public body." This question requires a preliminary determination as to whether the two Councilmen who met with the Narragansett Indians (Councilmen Beck and Craig) in and of themselves constituted a "public body" under the Act.
The definition of a "public body" contemplates defined entities within state and municipal government that are created as a result of state or municipal law, namely departments, agencies, commissions, committees, boards, councils, bureaus, authorities or other legal subdivisions of state or municipal government. Id. § 42-46-2(c). Consonant with other provisions of the Act, these are entities that are formally constituted, with duly elected or appointed members, defined jurisdiction, duties, and powers and the ability to advertise, vote at and record their meetings. The definition of "public body" does not include within its reach subsets of these specified categories of publicly-created entities that are not in and of themselves distinct entities but are merely members of an otherwise statutorily-defined public body. It also does not expressly include the individual members of the entities listed.[8]
As such, Councilmen Beck and Craig cannot be said to have comprised, in and of themselves, a "public body" within the meaning of the Act. These two individuals together are not a publicly-created entity such as a department, agency, commission, committee, board, council, bureau, or authority of or subdivision thereof of municipal government. They are merely members of a "public body" namely the Charlestown Town Council. Indeed, the Attorney General premises its complaint entirely on the theory that the meetings between Councilmen Beck and Craig and the Narragansett Indians were meetings between the Charlestown Town Council and the Narragansett Indians. See Plaintiff's Complaint, Count 5 ¶ 5 ("The June 22, 1995 meeting with the Tribe constituted a "meeting" of the Council, pursuant to R.I. Gen. Laws § 42-46-2."); Count 7 ¶ 5 ("The July 18, 1995 meeting with the Tribe constituted a "meeting" of the Council, pursuant to R.I. Gen. Laws § 42-46-2.")[9]
The next question, therefore, is whether the meetings between the two Councilmen and the Narragansett Indians were meetings between the public body known as the Charlestown Town Council and the Narragansett Indians so as to be subject to the Open Meetings Act. It is undisputed that the two Council members did not constitute a quorum of the Charlestown Town Council for purposes of those meetings. The resolution of this question thus depends upon whether the Act's application is restricted to meetings where a quorum of the public body is present.
All parties acknowledge that while the term "quorum" is defined in the Act, it does not appear elsewhere in the body of the Act. As such, there is no explicit quorum requirement in the Open Meetings Act. It must be determined, therefore, whether the legislature's intent to impose a quorum requirement can be inferred, as defendants' suggest, from the language of the Act.
In interpreting the Open Meetings Act to divine the intent of the General Assembly, several tenets of statutory construction must be considered. The Court must examine the entire statute as a whole and its individual sections must be viewed in the context of the entire statutory scheme and not as if each section were independent of all other sections. Sorenson v. Colibri,650 A.2d 125 (R.I. 1994). The meaning of the words in the statute can become clear by reference to other words in the statute. HowardUnion of Teachers v. State, 478 A.2d 563 (R.I. 1984). Every word, sentence or provision in a statute is presumed to have some useful purpose and intended to have some force and effect. Grossv. State Division of Taxation, 659 A.2d 670 (R.I. 1995). As a result, the statute should not be construed to render sentences, words or clauses mere surplusage. Brennan v. Kirby, 529 A.2d 633
(R.I. 1987). When necessary, in order to achieve the purpose of the statute, the Court may supply those words necessary to effectuate the intended meaning of the legislature. State v.Gonsalves, 476 A.2d 108 (R.I. 1984). Legislative enactments should not be interpreted as meaningless or nugatory if any other construction is reasonably possible. Ward v. City of Pawtucket,639 A.2d 1379 (R.I. 1994). In addition, the Court may not attribute to the legislature the intent to enact laws that lead to absurd or unreasonable results. State v. McDonald,602 A.2d 923 (R.I. 1992). When a statute under consideration has been previously amended, the Court must be cognizant of the fact that "it is generally true that, when a statutory provision is amended, the General Assembly is assumed to have intended to accomplish some purpose thereby, such purpose may be the clarification — rather than the alteration — of the original enactment." Hometown Properties, Inc. v. Fleming,680 A.2d 56, 62 (R.I. 1996).
The analysis of whether the Act imposes an implicit quorum requirement must begin with a review of how the Act defines a meeting. A "meeting" is the "convening of a public body." Id.
§ 42-46-2(a) (emphasis added). The term "convene," as used in this context, means an act by the individual members of a public body to formally constitute itself as that body. See Webster'sNew Universal Unabridged Dictionary 399 (2d ed. 1975) (defining "convene" as "to assemble implying a common purpose" and "to unite as things"); Black's Law Dictionary 330 (6th ed. 1990) (defining "convene" as "to call together," "to cause to assemble" or "to convoke"). For a public body to convene itself, its members must take action to make sure that the body itself comes into existence.
It is a basic tenet of state and municipal law that a public body does not exist and cannot meet or act as a body unless a quorum of its members is present. McQuillin, MunicipalCorporations § 13.01 at 757 and § 13.26 at 814 (3rd ed. 1987). The public body known as the Charlestown Town Council cannot convene itself or act unless it has a quorum present. Id.; seealso Robert's Rules of Order Newly Revised § 3 at 24 (9th ed. 1990), as adopted by the Charlestown Town Code § 15-32. Absent a quorum, therefore, a public body cannot "convene" itself and, if not convened, the public body is not "meeting" so as to be subject to the strictures of the Open Meetings Act. As such, the definition of the term "meeting" as "the convening of a public body" alone gives rise to the inference of a quorum requirement.
This interpretation is supported by the presence of the word "quorum," as a defined term, in the definitional section of the Act. Its placement within the definitional section of the Act is significant and suggests that the term "quorum" bears some relationship to the other defined terms. That definition states:
 Quorum, unless otherwise defined by the applicable law, means a simple majority of the membership of a public body.
Id. § 42-46-2(d). In this Court's view, the term "quorum" is defined, in accordance with its plain meaning, to describe how a public body convenes itself so as to constitute a "meeting" for purposes of the Open Meetings Act (i.e., by the assembly of a simple majority of its members or as otherwise dictated by the law governing the public body). Given that the Act does not define the term "convening," the definition of the term "quorum" is included to remove any doubt as to how a public body convenes itself so as to be "meeting" under the Act — doubt that otherwise might exist if the term "convening" were left undefined or if the law governing the public body were silent as to the definition of a quorum or as to how the body brings itself into existence or conflicted with the traditional notion that a public body convenes itself upon the presence of a simple majority of its membership.
Moreover, implying a quorum requirement is also in accord with other provisions of the Open Meetings Act. As previously mentioned, the Act, notwithstanding its broadly-stated purpose in the preamble, applies not to all meetings of all public officials (where arguably a quorum requirement could be inapplicable) but only to meetings of public bodies where a quorum requirement traditionally exists. See R.I. Gen. Laws §§ 42-46-1 et. seq.; McQuillin, Municipal Corporations § 13.01 at 757 and § 13.26 at 814 (3rd ed. 1987); see supra p. 31 n.8. The Act's provisions regarding the closure of meetings depends upon a vote by a quorum to close the meeting by open call that only can occur after the public body first has come into existence with a quorum. R.I. Gen. Laws § 42-46-4. In addition, the substance of the notices required to be given by public bodies under § 42-46-6 are the product of agendas prepared by the public body itself acting with a quorum. Further, the provisions of the Act regarding minutes embodied in § 42-46-7 contemplate recordation of the fact that a quorum of the public body either was or was not present to transact business at a meeting and the nature of any votes taken which only can occur if a quorum is present.
While the Attorney General contends that the General Assembly's 1984 amendment of the definition of "meeting" contained in § 42-46-2(a) reflects the absence of a quorum requirement, this Court disagrees. Prior to the amendment, the Act only reached meetings where a public body convened to "formally" discuss or act upon matters. The amendment removed the requirement of "formal" discussions or actions and broadened the definition of meeting to include more informal discussions and actions as might occur in a workshop or work session that a public body convenes.[10]
The Attorney General argues that the removal of the word "formally" and the expansion of the term "meeting" to include "workshops" illustrates a legislative intent to reach actions taken by a public body in the absence of formal requirements such as a quorum. This argument is unpersuasive, however, because the word "formally", which was deleted by the amendment, described the nature of the discussions and actions subject to the Act but not the manner in which a public body convenes itself. In addition, while broadening the Act's reach beyond formal discussion and actions, the legislature chose not to alter the requirement that a public body must "convene" in order to have a meeting (be it formal or informal) and further chose to leave the term "quorum" defined in the definitional section of the Act. By amending the Act, therefore, the General Assembly continued to limit its application to meetings where the public body convened itself with a quorum while making it clear that the Act would apply to such a meeting regardless of whether matters were discussed formally and voted upon or discussed informally in a workshop setting. Thus the amendment, while broadening the scope of the Act's applicability, did not alter the Act's quorum requirement.
To read the Act as not imposing a quorum requirement, as the Attorney General suggests, would violate basic tenets of statutory construction. This Court would have to interpret the term "quorum", as defined within the Act, as "meaningless and nugatory." Ward v. City of Pawtucket Police Department,639 A.2d 1379 (R.I. 1994). Such a construction must be avoided where interpreting the Act to impose a quorum requirement is not only "reasonably possible", id at 1328, but logical and internally consistent.
Moreover, imposing a quorum requirement is consistent with a majority of jurisdictions across the United States that have confined the application of their open meetings laws to a meeting of a majority or quorum of a public body. See, e.g., Ariz. Rev. Stat. § 38-431; Cal. Govt. Code § 9027; Conn. Gen. Stat. § 1-18A; Del. Code Ann. tit. 29 § 10002(e); Ga. Code. Ann. § 50-14-1; Haw. Rev. Stat. § 92-2; 5 Ill. Comp. Stat. 120/1.02; Ind. Code § 5-14-1.5-2; Iowa Code § 5.21.2; Ky. Rev. Stat. Ann. § 61.810; Mass. Gen. Laws Ann. ch. 30 A § 11A1/2 and ch. 39 § 23B; Md. Code. Ann., State government § 10-502; Mont. Code Ann. § 2-3-202; Nev. Rev. Stat. § 241.015; N.H. Rev. Stat. Ann. § 91-A:2; N.M. Stat. Ann. § 10-15-1; Ohio Rev. Code § 121.22; Okla. Stat. Tit. 25 § 304; Or. Rev. Stat. § 192.610; Tenn. Code. Ann. § 8-44-102; Tex. Gov't. Code Ann. § 551.001; Utah Code Ann. § 52-4-2; and Vt. Stat. Ann. tit. 1 § 310; W. Va. Code § 6-9A-2; See also Claude v.Collins, 518 N.W.2d 836, 840 (Minn. 1994). These jurisdictions, by requiring the existence of a majority or quorum, have recognized the importance of both the public's right to know and the government's need to function efficiently. This Court could locate no authorities where the term "quorum" was defined or used in the open meetings law and yet a quorum requirement was not imposed. Indeed, at least one jurisdiction has inferred a quorum requirement where the applicable open meetings statute was entirely silent as to quorum. See Claude v. Collins,518 N.W.2d 836, 840 (Minn. 1994) (citing Momberg v. Independent School Dist.No. 281, 336 N.W.2d 510, 517 (Minn. 1983)) (where the Minnesota Supreme Court held that in order to constitute a "meeting" or a "governing body" for purposes of the open meetings statute, a quorum of the body's members must be present).
This is not to say, however, that this Court condones public officials operating in the shadows. Indeed, if this ruling were to be "misconstrued as a license for abuse," the persons involved should think twice, for "[a] court of equity would not be powerless to devise an appropriate remedy in the face of conduct deliberately intended to defeat the Act's essential aims."Delaware Solid Waste Authority v. News-Journal, 480 A.2d 628, 634 (Del. 1984); R.I. Gen. Laws § 42-46-6(d) (stating that nothing contained in that "notice" section shall be used to circumvent the spirit and requirements of the chapter); Retzlaffv. Grand Forks Public School, 424 N.W.2d 637, 643 n.9 (Dakota 1988); Lynch v. Conta, 239 N.W.2d 313, 327 (Wisc. 1976). The quorum requirement, however, in the context of the Open Meetings Act as currently written, seeks to strike a balance between the public's right to know and the public's right to efficient and effective government. See Delaware Solid Waste Authority v.News-Journal, 480 A.2d at 635; Momberg v. Independent SchoolDist. No. 281, 336 N.W.2d at 517-518. Even with the quorum requirement, all meetings at which the Town Council or any other public body is capable of taking action or seeks to take action still must be properly noticed, held openly (unless closed properly) and recorded in minutes. In addition, any time a quorum of the members of the public body wish to meet to discuss or act upon official business — whether formally or informally — that meeting, too, must be public. To the extent there are meetings between members of the public body constituting less than a quorum either among themselves or with others, those individuals would be powerless to act as the public body itself, and the public body could not act as a result of those meetings without an airing of the content of those meetings and a vote by the public body itself in a proper open session. "The public's right of access at later stages in the decisionmaking process, and its accompanying right to question, is a strong safeguard that public servants remain accountable to the citizens." Delaware Solid Waste Authorityv. News-Journal, 480 A.2d at 635. Thus even with a quorum requirement, the Act establishes a mechanism to ensure that public bodies conduct their business openly and with public participation, informing citizens of the performance of their public officials and the deliberations and the decisions that create public policy.
Having found, therefore, that the Act implicitly imposes a quorum requirement — such that the Act is inapplicable to a meeting involving less than a quorum of a public body — the only remaining task is to apply that requirement to the meetings between representatives of the Charlestown Town Council and the Narragansett Indians to determine if those meetings are exempt from the Act's strictures. Under the Act, a quorum is a simple majority of the members of a public body unless defined differently by the law governing the body. R.I. Gen. Laws §42-46-2(d). The Charlestown Town Charter, like the Open Meetings Act, defines quorum as "the majority of the qualified members." Charlestown Town Charter § C-28(b). The Charter provides that the Town Council "shall consist of five (5) members, elected at large" such that three out of five qualified members would constitute a quorum. See also Charlestown Town Code § 15-6 (stating that "[a] quorum shall consist of three (3) members of the Council; provided however, that a majority of the members of the Council present and voting, whether or not a quorum shall be present, may vote to adjourn.")
Under the Charlestown Town Code enacted by the Charlestown Town Council, which incorporates Robert's Rules of Order Revised (75th Anniv. ed. 1951), a quorum is required not only for the Council to transact official business and vote but also for it to exist at all.[11] As it is undisputed that less than a quorum of the Town Council met with the Narragansett Indians on June 22, 1995 and July 18, 1995 (i.e., Councilmen Beck and Craig — only 2 out of the 5 qualified members of the Council at the time), those meetings did not involve the Charlestown Town Council as a public body and cannot be deemed to be meetings subject to the strictures of the Open Meetings Act. As a result, there is no basis upon which to find that any of the defendants violated the Open Meetings Act with regard to the conduct of the meetings of June 22, 1995 and July 18, 1995 between the two Council members and the Narragansett Indians as asserted in Counts 5 and 7 of the Complaint.
Moreover, even assuming, arguendo, that the Act does not impose a quorum requirement, the same result would obtain. Absent an explicit quorum requirement, some courts have imposed a quantitative, qualitative balancing test to determine whether the meeting should be subject to open meetings requirements. See,e.g. Bigelow v. Howze, 291 So.2d 645 (Fla. Dist. Ct.App. 1974);Lynch v. Conta, 239 N.W.2d 313 (Wisc. 1976). Under this test, "to trigger the open meetings law, there must be a purpose to engage in governmental business . . . and the numbers present must be sufficient to determine the parent body's course of action regarding the proposed discussion." McQuillin, MunicipalCorporations § 13.07.30 at 788 (3rd ed. 1987). Information gathering by a nonmajority alone and in the absence of power is not sufficient to show a violation. See generally, Paulton v.Volkmann, 415 N.W.2d 528 (Wisc. Ct.App., 1987); Delaware SolidWaste Authority v. News-Journal, 480 A.2d 628 (Del., 1984);Bigelow v. Howze, 291 So.2d 645 (Fla. Dist. Ct.App., 1974).
Here, the Council itself did not attend the meetings of June 22, 1995 and July 18, 1995 by virtue of the absence of a quorum of its members. In going to the meetings, Councilmen Beck and Craig were not given the power to act on behalf of or to bind the Council, they did not undertake any negotiations or enter into any binding agreements, and their intent was not to thwart the Open Meetings Act. Instead, the Council's intent in sending them and their intent in going was to facilitate an information-gathering session with the Narragansett Indians who insisted that the meetings be on tribal lands and not public. Unfortunately, the Council was presented with a Hobson's choice: either refuse to meet with the Narragansett Indians and risk alienating the very party with whom the Town was trying to forge a constructive relationship or agree to a meeting with two Councilpersons present which was closed on the insistence of the Narragansett Indians and risk a violation of the Open Meetings Act. While there may have been the absence of sunlight during the actual meetings between the Council representatives and the Narragansett Indians, the Council discussed those planned meetings at open, public Council meetings and Councilmen Beck and Craig reported the product of their meetings with the Narragansett Indians at subsequent Council meetings. As a result, the public had the opportunity to discuss the meetings in advance, learn when and where the meetings were taking place and hear a discussion of the information gathered by the Councilmen upon their return.[12] Alternatively, therefore, under both a qualitative and quantitative analysis, no violation of the Act can be found with regard to the meetings of June 22, 1995 and July 18, 1995 between the two Council members and the Narragansett Indians under Counts 5 and 7 of the Complaint.[13] Absent a violation of the Act, there is no basis to find that any of the defendants acted willfully as asserted in Counts 6 and 8 of the Complaint. Thus judgment shall enter for the defendants as to Counts 5, 6, 7 and 8 of the Complaint.
The July 25, 1995 Meeting of the Charlestown Town Council(Counts 9 and 10)
In Count 9 of the Complaint, the Attorney General asserts that the Charlestown Town Council violated the minutes requirements of the Open Meetings Act, R.I. Gen. Laws §§42-46-7(a)(3), (b), by failing to record in the minutes of the meeting of July 25, 1995 certain motions made by Councilpersons Craig and Dunn, and the discussion and votes concerning those motions. While plaintiff acknowledges that the final minutes reflected these matters, it is undisputed that the draft minutes (which were the only minutes available to the public within the two-week timeframe required by the Act) failed to include the requisite information. In Count 10 of the Complaint, plaintiff alleges that these technical minutes violations were committed willfully under R.I. Gen. Laws § 42-46-8(d).
After the conversation that the Governor's legal counsel, John Partridge, had with Councilman Beck and Solicitor Sloan, it became apparent that there was no longer a need for the special meeting that the Council scheduled for July 25, 1995. That meeting had been called for the express purpose of addressing the Narragansett Indian's request for Town input on the proposed gaming facility, and the Governor did not want the Town discussing this issue with the Narragansett Indians because he believed that he had exclusive jurisdiction over the issue. After Councilman Beck called the July 25, 1995 meeting to order, the Council by unanimous vote moved into executive session.[14]
Upon reopening the meeting from this executive session, Councilman Beck read in part the following:
 I, as Council President, and with our solicitors, have been in regular contact with the Governor's Counsel. Based on conversations held this afternoon and out of consideration for the Governor's position, I have concluded that this evening's meeting should not be held.
Councilman Craig then moved to adjourn the meeting. This motion failed to pass when Councilpersons Dunn and Safford objected because they believed the Council should entertain comments.
Councilwoman Dunn then made a motion to make a motion. After this motion carried, she made the following substantive motion:
 At the suggestion of Governor Almond, the Charlestown Town Council and the Narragansett Tribal Council have agreed to meet to discuss matters of mutual importance. The Narragansett Tribal Council has asked that these talks be held in closed session. In order to avoid a quorum and to meet the requirements of [the Open Meetings Act], the Charlestown Town Council elected to send two Council members at a time to participate in closed meetings with the Narragansett Tribal Council. Although it appears that this procedure may not strictly be a violation of the Open Meetings Law it gives the appearance of attempting to circumvent the law. . . . I therefore propose the following motion that the Charlestown Town Council immediately suspend all actions to dilute the intent of the Open Meetings Law and instead work to arrange public meetings with the Narragansett Tribal Council.
The Council discussed her motion, but it failed to carry by a vote of two-to-two.
Councilman Beck then answered a question for a citizen as to what other issues besides gaming were discussed at the July 18, 1995 meeting with the Narragansett Indians. Other citizens expressed opposition to the meetings and requested that more information about the planned discussion topics be provided in advance. Councilman Safford then moved to adjourn the meeting. This motion passed unanimously, and the meeting was adjourned.
The draft minutes make no mention of Councilman Craig's defeated motion to adjourn, Councilwoman Dunn's motion to make a motion, or her motion to cease the closed meetings with the Narragansett Indians. In addition, the draft minutes do not reflect any of the discussion during these motions. The final minutes reference all of these motions, votes and discussions.
The Open Meetings Act requires that all public bodies keep written minutes of all of their meetings. Id. § 42-46-7. These minutes must include the date, time, and place of the meeting, along with a record of all votes taken at the meeting and how each member voted. Id. § 42-46-7(a). These minutes shall be available to the public within two weeks of the date of any such vote. Id. § 42-46-7(b). Thus the draft minutes, which were the only minutes made available to the public within two weeks of the July 25, 1995 meeting, violated the provisions of § 42-46-7
because they did not reflect the aforementioned motions or the discussion or votes on those motions.
This Court is not satisfied, however, that the omission of the information from the draft minutes was anything other than negligent error. There was no evidence adduced at trial to suggest that Marcia D. Carsten, the Charlestown Town Clerk in charge of preparing the minutes, was asked to or intended to leave the material in question out of the draft minutes or that she otherwise acted recklessly in doing so. As a matter of fact, the requisite information was included in the final version of the minutes ultimately prepared and made available to the public, albeit not in a timely fashion. This Court declines, therefore, to find a willful violation of the Act.
Accordingly, judgment shall enter for the plaintiff against the Council as to Count 9 of the Complaint as a result of the Council's failure to prepare accurate minutes of the July 25, 1995 meeting in a timely manner, in violation of § 42-46-7 of the Act. While plaintiff asks, as a result of this violation, that the action taken at the July 25, 1995 meeting be declared null and void, there was no action taken at that meeting that is appropriate for invalidation. The Council is enjoined, however, from engaging in similar future violations of the Act and is directed to review its procedures with regard to the taking and preparation of minutes to ensure that minutes are prepared accurately, verified for accuracy by the Council, and made available to the public thereafter no later than two weeks after the meeting. All other claims asserted by plaintiff against the defendants which are not addressed by this Court in this decision are denied and dismissed.
Counsel for plaintiff and counsel for the defendants shall confer and submit to the Court forthwith for entry an agreed upon form of order and judgment, consistent with this decision.
[1] During the pendency of this action, defendant Mary Hargraves died. As a result, the Attorney General filed a suggestion of death in the record, and the parties agreed, pursuant to written stipulation filed on November 6, 1996, to dismiss her from the action.
[2] These minutes were not unsealed for purposes of this trial. In addition, while the Court has before it audio tapes for the other meetings at issue, no tapes of either the executive or open sessions of the June 7, 1995 Council meeting are in evidence. The content of those sessions, therefore, can be gleaned only from those portions of the minutes which were not sealed and related testimony.
[3] While the minutes do not state that Mr. Goodsell was in attendance at the June 12, 1995 Council meeting, statements within the minutes are attributed to him.
[4] The irony is that had the Attorney General given the requested advisory opinion, this litigation might have been avoided. While this Court can appreciate the apparent difficulty in having the Attorney General give advice when his defined role under the Open Meetings Act is that of investigator and prosecutor, the Attorney General also has a strong interest in educating public bodies to avoid violations of the Open Meetings Act and to minimize the need to prosecute. Indeed, the Attorney General performs both an advice-giving and a prosecutorial function with regard to alleged violations of the Open Meeting Act by state agencies and officials. See R.I. Gen. Laws § 42-9-6.
Many governmental agencies at both the state and federal level advise on regulatory compliance while also acting in a prosecutorial capacity. The Rhode Island Ethics Commission, for example, issues advisory opinions regarding the ethical obligations of public officials and opines as to whether certain proposed actions are in compliance with its regulations, while also investigating and adjudicating charges of ethical impropriety in the first instance. See R.I. Gen. Laws §§ 36-14-11, 12, and 13. In addition, the Securities and Exchange Commission issues no action letters which, while non-binding, advise individuals on the appropriateness of actions and interpret regulations with which the Commission is charged with enforcing.See Kenler v. Canal National Bank, 489 F.2d 482, 486 [1st Cir. 1973); Rogen v. Ilikon Corp., 361 F.2d 260, 264 (1st Cir. 1966). By establishing formal means of ensuring compliance, these agencies may prevent violations from occurring due to lack of knowledge or understanding, while at the same time eliminating the defense of ignorance with regard to instances of willful blindness.
It does not appear that the Attorney General is restricted as a matter of law from giving advice to public bodies or officials with regard to compliance with the Open Meetings Act. Such advice, if followed, could eliminate the need to prosecute, although it still might leave the public body or official open to a private right of action under § 42-46-8(c) should the Attorney General decline to prosecute. Were the Attorney General to assume an advice-giving function under the Open Meetings Act, either as a matter of policy or by statutory directive, the Attorney General could enhance compliance by public bodies and officials with the Act and set the stage for aggressive prosecution were that advice found later to be legally correct and yet willfully ignored. See In Re House of Representatives, 575 A.2d 176, 179 (R.I. 1990); Suitor v. Nugent, 98 R.I. 56, 60 (1964).
[5] Councilwoman Hargraves planned to attend this meeting with the Narragansett Indians together with Councilman Craig, but an illness prevented her from doing so. Councilman Beck attended in her place.
[6] The claims of willfulness that the Attorney General asserted against defendant Hargraves and plaintiff's related request that civil fines be imposed against her are no longer pending as a result of her death and dismissal as a party defendant from the action. See supra n.1.
[7] A quorum of the Council was present at this meeting of June 7, 1995, as it was attended by all five Council members. As such, the parties do not dispute that the Act applies to this meeting. Plaintiff does not claim that any of the alleged violations of the Open Meetings Act arising out of the June 7, 1995 Council meeting were willful.
[8] If this Court were to infer that individual members of a public body were in and of themselves a "public body" for purposes of the Act, the definition of "public body" under the Act would be turned on its head. The Act then would reach to a meeting between one member of a public body meeting with another governmental or non-governmental entity or public official (as opposed to being limited to a meeting of or with the public body itself) — something even the Attorney General does not believe the General Assembly intended when it enacted the Act.See Donley v. Begin, Attorney General's Unofficial Opinion # 95-07); see also Trial testimony of C. Dunn.
[9] While the Attorney General attempts in its post-trial memorandum to characterize the two Councilmen as a separate "public body" such as a "committee" or "subdivision", this assertion does not square with the definition of "public body" in the Act (which does not include "members" of an otherwise defined entity) and contradicts the plaintiff's own complaint. Had the Attorney General intended to sue the two Councilmen as a separate public body, it would have named this other "public body" as a party-defendant and sued them, not as Councilmen, but in their official capacities as members of this other unspecified public body. In addition, the injunctive relief sought would not be against the Council or certain of its members acting in their official capacities, but against this other entity. Instead, the Attorney General sued the Councilmen as Councilmen, and sought declaratory and injunctive relief prohibiting the Charlestown Town Council from acting in certain ways.
[10] Prior to the 1984 amendment, the Act defined "meeting" as:
the convening of a public body to formally discuss and/or act upon a matter over which the public body has supervision, control, jurisdiction or advisory power.
P.L 1984, ch. 372. The 1984 amendment to the Act redefined "meeting" as:
the convening of a public body to discuss and/or act upon a matter over which the public body has supervision, control, jurisdiction, or advisory power. As used herein, the term "meeting" shall expressly include, without limiting the generality of the foregoing, so-called "workshop," "'working," or "work" sessions.
R.I. Gen. Laws § 42-46-2(a).
[11] Pursuant to its power to establish its own rules of operation, the Charlestown Town Council enacted Charlestown Town Code § 15-32 which states that "[i]f there are any parliamentary practices, procedures, customs and rules not covered within this chapter, Robert's Rules of Order, revised, 75th Anniversary Edition, shall govern." This Court's references, however, are to the current version of Robert's Rules of Order.
Robert's Rules of Order establish that "[t]he basic principle of a decision in a deliberative assembly [such as a city or town council] is that, to become the act or choice of the body, a proposition must be adopted by a majority vote; that is, direct approval-implying assumption of responsibility for the act must be registered by more than half of the members present and voting on the particular matter, in a regular or properly called meeting at which the necessary minimum members, known as the quorum . . . is present." Robert's Rules of Order Newly Revised, § 1 at 43 (9th ed. 1990). In Section 3, this quorum requirement is explained as being necessary for the protection against totally unrepresentative action in the name of the body by an unduly small number of persons. Robert's Rules of Order § 3 at 20.
This quorum requirement must be satisfied not only if the Council wishes to vote or take official actions, but also for it to exist at all, for "when the time of the meeting has arrived, the presiding officer [the Town Council President] opens it,after he has determined that a quorum is present, by calling the meeting to order. Robert's Rules of Order § 3 at 24 (emphasis added). Accordingly, if a quorum is not present at the beginning of the meeting or at any point thereafter, the members of the Council can take no official actions, except to adjourn or wait for a quorum to be established. It follows, therefore, that in order for the individual council members to exist as the entity known as the "Charlestown Town Council", and to thereby become a public body, a quorum of its members must be present.
[12] Had the Counsel empowered Councilmen Beck and Craig to act for the majority of the Council in negotiations or making decisions or if the evidence showed that the two had been sent or acted with the specific intent to violate the Open Meetings Act, perhaps the analysis would be different under the qualitative and quantitative balancing test.
[13] Arguing in defense of their actions, defendants assert that if the Act applies to meetings involving less that a quorum of the members of a public body, then the statute is unconstitutionally vague. Because this Court has ruled that the Act does not apply to meetings of less than a quorum of a public body and that even if no quorum requirement exists, there is no violation here under a qualitative and quantitative analysis, it is not necessary to address issues related to the defendants' "void for vagueness" arguments. See King v. Williamson,103 R.I. 640, 240 A.2d 408 (R.I. 1968) (stating that "[i]t is a well-settled principle, often stated by this Court, that the constitutionality of a statute will not be passed upon if that question can be avoided.")
[14] Only four out of the five Council members were present at this meeting: Councilpersons Beck, Craig, Dunn and Safford.